| | |
|---|---|
| 1 | **BURSOR & FISHER, P.A.** |
| 2 | Philip L. Fraietta (State Bar No. 354768)<br>Julian C. Diamond (*pro hac vice* forthcoming) |
| 3 | Andrew Obergfell (*pro hac vice* forthcoming)<br>1331 Avenue of the Americas, 32nd Floor |
| 4 | New York, NY 10019<br>Telephone: (646)-837-7150 |
| 5 | Facsimile: (212) 989-9163<br>Email: pfraietta@bursor.com |
| 6 | jdiamond@bursor.com<br>aobergfell@bursor.com |
| 7 | *Attorneys for Plaintiff* |

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LISA TSERING, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | <u>JURY TRIAL DEMANDED</u> |
| META PLATFORMS, INC., fka FACEBOOK, INC., | |
| Defendant. | |

Plaintiff Lisa Tsering ("Plaintiff"), by and through her attorneys, makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to allegations specifically pertaining to herself, which are based on personal knowledge, against Defendant Meta Platforms, Inc., fka Facebook, Inc. ("Facebook" or "Defendant").

**NATURE OF THE ACTION**

1. Facebook is both a social media company and one of the largest data aggregators in the world.

2. Facebook violates state law by surreptitiously acquiring and tracking consumers' precise geolocation data and other data without authorization, aggregating it with other data points, and then monetizing the data.

3. Facebook does so through its development and dissemination of a software development kit ("SDK"), which contains "component SDKs," like the Facebook Audience Network SDK, that enables backdoor access to consumers' devices and opens a direct data collection pipeline to Facebook (Facebook's SDKs are collectively referred to as the "Facebook SDK"). Tens of thousands of app developers have embedded the Facebook SDK into their mobile apps, allowing Facebook to siphon data from consumers.

4. Specifically, the Facebook Audience Network SDK is part of Facebook's advertising services that allows advertisers to place Facebook ads onto third party mobile applications that have incorporated the Facebook Audience Network SDK into its application. However, the Facebook Audience Network SDK functions to transmit certain information from the third-party application back to Facebook, including user activity within the application and the user's precise location.

5. Indeed, Facebook has admitted to collecting location date through the Facebook SDK in a notice directed toward third-party developers: "To provide functionality within the Facebook SDK, we may receive and process certain contact, **location**, identifier, and device information associated with Facebook users and their use of your application."[1]

---

[1] https://developers.facebook.com/blog/post/2022/07/18/resources-for-completing-app-store-data-practice-questionnaires-apps-facebook-or-audience-network-sdk/#:~:text=To%20provide%20functionality%20within%20the%20Facebook%20SDK%2C,users%20and%20their%20use%20of%20your%20application.&text=Note:%20Since%20Facebook%20

6. Similarly, in 2018, a BuzzFeed article explained the symbiotic relationship between Facebook and third-party application developers that incorporated the Facebook SDK: "Through its SDK, Facebook provides app developers with data about their users, including where you click, how long you use the app, **and your location when you use it**. In exchange, **Facebook can access the data those apps collect, which it then uses to target advertising relevant to a user's interests**."[2]

7. The data Facebook collects and uses can include consumers' private movements to and from sensitive locations, like locations associated with medical care, reproductive health, religious worship, mental health, rallies, demonstrations, or protests. The collected location data reveals sensitive information about each consumer, such as their religious affiliation, sexual orientation, and medical conditions. This enormous volume of data enables Facebook and its advertising partners to build a comprehensive profile about each consumer, including their movements and whereabouts.

8. In addition to acquiring this private data without consumers' informed consent, Facebook fails to notify consumers that it then aggregates that location data with other data points to develop consumer profiles. Nor does Facebook notify consumers that this data will be used for targeted advertising. It does all of this without consumers' consent.

9. Plaintiff is an individual who asserts claims on behalf of herself and class members for violations of California privacy statutes.

**PARTIES**

10. Plaintiff Lisa Tsering is a resident of El Cerrito, California. Plaintiff Tsering downloaded one or more phone applications which contained the Facebook SDK and/or Facebook Audience Network SDK ("Apps").

11. These Apps include but are not necessarily limited to Candy Crush Saga.

---

Login%20is%20part%20of,use%20Facebook%20Login%2C%20depending%20on%20your%20settings. (last visited 2/13/25).

[2] https://www.buzzfeednews.com/article/charliewarzel/apps-are-revealing-your-private-information-to-facebook-and (last visited 2/13/25).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                               2

12. While she had these Apps on her phone, Plaintiff Tsering routinely traveled with her phone to various locations—including her home, work, medical appointments, religious services, and other places she considers sensitive and private.

13. At the time Plaintiff Tsering downloaded the Apps, she believed that the Apps would not transfer her geolocation data to another entity for the purposes of monetizing said data.

14. However, that was not the case: the Apps sent location data to Defendant when Plaintiff Tsering used the Apps. During that entire time, the Apps tracked the geolocation of Plaintiff Tsering. In turn, Defendant tracked Plaintiff Tsering's geolocation in California, and then monetized that data for profit. Plaintiff Tsering suffered her primary injury in California.

15. During the time Plaintiff Tsering used the Apps, Defendant obtained Plaintiff Tsering's geolocation data from the App and then monetized that location data by incorporating it into its advertising products.

16. Prior to collecting timestamped geolocation information, unique device IDs, device fingerprint data, and information about which locations she visited, neither Facebook nor the Apps informed or otherwise disclosed to Plaintiff that the Facebook SDK and/or Facebook Audience Network SDK was embedded in the Apps, or that if she used the Apps, Facebook would collect her precise geolocation information. Plaintiff did not consent to Facebook's collection.

17. If Plaintiff Tsering had been aware that Defendant would receive and monetize her geolocation data, Plaintiff Tsering would not have used the Apps.

18. Defendant Meta Platforms, Inc. is a Delaware corporation with its principal place of business in Menlo Park, California.

19. Facebook obtains the location data of at least hundreds of millions of active users each month.

20. The list of applications which have used the Facebook SDK and/or Facebook Audience Network SDK or otherwise sent location data to Facebook is not public or available to Plaintiff but is known to Facebook.

21. Facebook conceals its application list from the public.

22. The means through which Facebook obtains location data is further concealed by its use of third-party applications and data sources.

23. When the *New York Times* analyzed location tracking companies in December 2018, it reported that Perfect365, an application which has used a similar SDK, "said it could not discuss any data practices because of nondisclosure agreements."

24. In 2018, Jennifer Valentino-DeVries, one of the "tech reporters on the *NY Times* Investigations team that uncovered how companies track and sell location data from smartphones," participated in an "Ask Me Anything" discussion on Reddit.[3]

25. Valentino-DeVries stated that she could not suggest a list of tracking applications to delete to protect consumer privacy because "in the course of reporting, we learned that many apps gather the data, get it on their servers and then sell it to other companies. We can't see that kind of sharing, can't test it, and can't learn about it unless the companies respond to us and acknowledge it."

26. In 2019, Charlie Wartzel and Stuart Thompson, authors of *The New York Times* feature "One Nation, Tracked," which "looked at the movements of 12 million Americans based on phone location data," also participated in an "Ask Me Anything" discussion on Reddit.[4] They echoed Ms. Valentino-DeVries' findings:

> Naming specific apps is difficult because companies rarely disclose who they work with. Honestly, this is one of the most frustrating things with reporting on this industry. It's a real black box — even people who work in the weeds don't quite know where information is going . . . or where it's been.

---

[3] *I'm Jennifer Valentino-DeVries, a tech reporter on the NY Times investigations team that uncovered how companies track and sell location data from smartphones. Ask me anything.*, Reddit https://www.reddit.com/r/IAmA/comments/a7cnc0/im_jennifer_valentinodevries_a_tech_reporter_on/?sort=confidence (last visited Dec. 17, 2024).

[4] *We are Charlie Warzel and Stuart Thompson of The New York Times Opinion Section. Let's talk about our project, "One Nation, Tracked," looking at the movements of 12 million Americans based on phone location data. Ask us anything.*, Reddit https://www.reddit.com/r/IAmA/comments/edd7ns/we_are_charlie_warzel_and_stuart_thompson_of_the/ (last visited Dec. 17, 2024);

*See also, e.g.,* Stuart A. Thompson and Charlie Warzel, *Smartphones Are Spies. Here's Whom They Report To.,* The New York Times (Dec. 20, 2019), https://www.nytimes.com/interactive/2019/12/20/opinion/location-tracking-smartphone-marketing.html.

27. Plaintiff has numerous applications on her devices, in addition those identified above.

## JURISDICTION AND VENUE

28. Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2) because this is a class action in which at least one member of the class is a citizen of a state different from any Defendant, the amount in controversy exceeds $5 million, exclusive of interest and costs, and the proposed class contains more than 100 members.

29. This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the District.

30. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District and because Defendant maintains its principal place of business in this district.

## FACTUAL ALLEGATIONS

**A. Facebook collects sensitive information from App users on hundreds of millions of mobile devices.**

31. Facebook collects consumer location data through its Facebook SDK (including the Facebook Audience Network SDK) incorporated into third-party mobile applications.

32. The Facebook SDK and Facebook Audience Network SDK is a collection of development tools that can be incorporated into a mobile application.

33. The Facebook Audience Network SDK's function is to allow third-party application developers to deliver targeted advertising to its users generated by Facebook. As part of this process, the Facebook Audience Network SDK collects user's location data of all mobile application users who have the Facebook Audience Network SDK spyware embedded in their Apps, and transmit the consumer's precise location back to Defendant.

34. Thus, through the use of its spyware, Facebook monitors, tracks, and identifies consumers in real time, including Plaintiff and other putative class members.

35. Defendant fails to notify consumers that their location data will be used for targeted advertising and fails to verify that Apps incorporating the Facebook Audience Network SDK have notified consumers of such use.

36. Defendant incorporates the Facebook Audience Network SDK into tens of thousands of third-party Apps, which have been downloaded onto at least hundreds of millions of unique devices.

37. Apps that incorporate the Facebook Audience Network SDK request access to the location data generated by a mobile device's operating system.

38. Critically, the Facebook Audience Network SDK receives the device's precise latitude and longitude, along with a timestamp and unique mobile device identifier, as often as the mobile device's operating system provides it— ranging from almost no collection when the device is idle, to every few seconds when the device is actively moving—and transmits it directly to Defendant's servers.

39. Defendant collects sensitive information from consumers, including where they live, where they work, where they worship, where their children go to school or obtain child care, where they received medical treatment (potentially revealing the existence of medical conditions), whether they went to rallies, demonstrations, or protests (potentially revealing their political affiliations), and any other information that can be gleaned from tracking a person's day-to-day movements.

40. This information is collected with several identifiers (including a unique mobile device identifier).

41. Indeed, when enabling location services within an app, the consumer grants consent for only the mobile app to use his or her location. At no point does Facebook inform consumers that its SDK is collecting their sensitive geolocation data, nor does it prompt consumers to grant Facebook permission to access or collect any data whatsoever.

**B.      Location tracking like Facebook's is invasive.**

42.     In December 2018, *The New York Times* published an article entitled, "Your Apps Know Where You Were Last Night, and They're Not Keeping It Secret."[5] The article discussed how even supposedly anonymized location tracking can reveal individual identity through, for example, a consumer's work commute or time spent regularly at a home address. The article discussed how such tracking applications gather private information, noting one woman's concerns about tracking of her visit for medical procedure, a Weight Watchers meeting, and a stay at an ex-boyfriend's home. The article noted that "explanations people see when prompted to give permission are often incomplete or misleading" and do "not mention that the data will be shared and sold."

43.     As *The New York Times* reported in a September 2020 article entitled, "How Mobile Phones Became a Privacy Battleground—and How to Protect Yourself," phone users do not understand that their data is being tracked[6]:

> [I]t [is] nearly impossible for phone owners to track where their data goes or how it gets used, let alone prevent that data from being shared in the first place. . . . [T]he industry has no standards to follow, so it's difficult for everyone to figure out what is and isn't possible on any given device. What phone owners have instead are sometimes-complicated menus full of permissions that are buried deep within an operating system and rarely set up by default with their privacy in mind.

44.     The article quotes an in-house privacy attorney and data-protection officer discussing her fears about companies using SDKs the way Facebook does:

> Whitney Merrill, a privacy attorney and data-protection officer, told us that what scares her most "are the SDKs and random packages that people are throwing in that still collect data in ways that weren't anticipated." Merrill described a hypothetical—though not unlikely—scenario in which an app developer monetizes its app by putting in a bunch of different advertising SDKs to leverage as many networks as possible. But because the developer hasn't investigated the privacy practices of those ad networks, those SDKs could take

---

[5] Jennifer Valentino-DeVries, et al., *Your Apps Know Where You Were Last Night, and They're Not Keeping It Secret*, The New York Times (Dec. 10, 2018), https://www.nytimes.com/interactive/2018/12/10/business/location-data-privacy-apps.html.

[6] Thorin Klosowski, *How Mobile Phones Became a Privacy Battleground-and How to Protect Yourself*, The New York Times Wirecutter (Sept. 29, 2022), https://www.nytimes.com/wirecutter/blog/protect-your-privacy-in-mobile-phones/.

> all the data that passes through them when you use the app, package that data up, and then sell it; these entities could continue to pass your data along, combining it with data from other companies until it forms a clear picture of your behavior. This data can be bought and sold for advertising purposes, or purchased by agencies of the US government.

45. A private investigator was able to obtain consumer data from another data broker like Facebook: Babel Street. Like Facebook's technology, Babel Street's Local X "tool relies on the mobile advertising ID that Google and Apple assign to each phone to serve users targeted ads. Advertisers can then build a growing profile of information around that ID based on where it accesses services that deliver ads."[7]

46. But the nature of such tracking means that individuals are followed well beyond their shopping trip, actively tracking their whereabouts, including the most private moments of their lives:

> [T]he data . . . allowed a reporter to zoom in on the parking lot of an abortion clinic in Florida and observe more than 700 red dots, each representing a phone that had recently visited the clinic. Location X then allowed the reporter to trace the movements of one specific device.
>
> That device—and by extension, the person carrying it—began the journey in mid-June from a residence in Alabama. The person passed by a Lowe's Home Improvement store, drove on a highway, visited a church, crossed into Florida, and finally stopped at the clinic where the phone indicates the person stayed for two hours before leaving and returning to Alabama. The data tracked the phone as having visited the clinic only once.[8]

47. One advertising group previously used location data to target "abortion-minded" women with anti-choice advertising.[9]

---

[7] Emma Roth, *An investigation exposes data brokers using ads to help track almost any phone*, The Verge (Oct. 23, 2024), https://www.theverge.com/2024/10/23/24277679/atlas-privacy-babel-street-data-brokers-locate-x-tracking.

[8] Dan Goodin, *Location Tracking of phones is out of control. Here's how to fight back.*, Ars Technica (Oct. 23, 2024), https://arstechnica.com/information-technology/2024/10/phone-tracking-tool-lets-government-agencies-follow-your-every-move/.

[9] Sharona Coutts, *Anti-Choice Groups Use Smartphone Surveillance to Target 'Abortion-Minded Women' During Clinic Visits*, Rewire News Group (May 25, 2016), https://rewirenewsgroup.com/2016/05/25/anti-choice-groups-deploy-smartphone-surveillance-target-abortion-minded-women-clinic-visits/.

48. While details about Facebook's data cache remain opaque and in its sole possession, Facebook undoubtedly collected consumers' precise, minute movements, to private locations, unrelated to any consented-to services.

C. **Defendant fails to verify that users of third-party apps incorporating Facebook's SDK have been notified that their location data will be used to target advertising.**

49. Defendant does not adequately require third-party Apps to obtain informed consumer consent.

50. Defendant does not disclose that information collected from these third-party users will be supplemented and cross-referenced with other data and analyzed to draw inferences about those users for marketing purposes.

51. Defendant therefore does not know whether users of thousands of third-party Apps were informed of their data being collected and used for targeted advertising.

D. **Facebook Ensures that Collected Consumer Data Does Not Remain Anonymous.**

52. As a preliminary matter, geolocation information is sensitive data that necessarily reveals a consumer's identity. Geolocation coordinates together with timestamp data—exactly the type of data Facebook collects—can reveal a consumer's home address, work address, and any other location they visit.

53. Indeed, researchers from MIT found that a small location data sample is sufficient to identify an individual. The researchers analyzed timestamped location data for 1.5 million individuals over 15 months and found that only four timestamped locations are sufficient to identify 95% of individuals. Given 11 data points, the researchers could identify all individuals in the study. The reason for the findings is obvious: individuals have unique movement patterns, and it is not likely that someone else will be in the same locations at four different times of the day.

54. The researchers commented that an individual may be identified with less than four data points simply by exploiting irregularities in an individual's behavior.

55. By collecting timestamped geolocation data, unique device identifiers, and device fingerprint data, Facebook can connect an ostensibly "anonymous" ID (such as a MAID or other

unique device identifier) to an individual and then collect data on their interests and activities. Facebook can then create a comprehensive consumer profile by combing through this data.

## CLASS ALLEGATIONS

56. **Class Definition.** Plaintiff brings this action on behalf of a class of similarly situated individuals, defined as:

> All persons who reside in the United States whose data, including but not limited to their geolocation data, was collected by Defendant without their consent.

(the "Nationwide Class").

57. Plaintiff brings this action on behalf of a class of similarly situated individuals, defined as:

> All persons who reside in California whose data, including but not limited to their geolocation data, was collected by Defendant without their consent.

(the "California Class" and together with the Nationwide Class, the "Classes").

58. Excluded from the Classes are Defendant and any entities in which Defendant has a controlling interest, Defendant's agents and employees, the judge to whom this action is assigned, and members of the judge's staff, and the judge's immediate family.

59. Subject to additional information obtained through discovery, the foregoing class definition may be modified or narrowed by an amended complaint, or at class certification, including through the use of multi-state subclasses to account for material differences in state law, if any.

60. **Numerosity.** Members of the Classes ("Class Members") are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the millions. The precise number of Class Members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class Members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

61. **Commonality and Predominance.** Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members. Common legal and factual questions include but are not limited to:

   (a)  Whether Defendant used a pen register;

   (b)  Whether Defendant obtained consent from Plaintiff and the Classes or otherwise obtained a warrant to install and use a pen register;

   (c)  Whether Defendant accessed Plaintiff's and the Classes's computer systems; and

   (d)  Whether Defendant sought Plaintiff's and the Classes's permission to access their computer systems.

62. ***Typicality.*** The claims of the named Plaintiff are typical of the claims of the Classes in that Defendant accessed Plaintiff's device and siphoned her geolocation information and other personal information without her consent, causing her the same injuries Defendant caused all other members of the Classes.

63. ***Adequacy.*** Plaintiff is an adequate representative of the Classes because her interests do not conflict with the interests of the Class Members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of Class Members will be fairly and adequately protected by Plaintiff and her counsel.

64. ***Superiority.*** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

# COUNT I
## Violation of the California Computer Data Access and Fraud Act
## Cal. Penal Code. § 502

65. Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

66. Plaintiff brings this claim individually and on behalf of the members of the Classes.

67. The California legislature enacted the CDAFA with the intent of "expand[ing] the degree of protection afforded to individuals … from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code §502(a). The enactment of CDAFA was motivated by the finding that "the proliferation of computer technology has resulted in a concomitant proliferation of … unauthorized access to computers, computer systems, and computer data." *Id.*

68. Plaintiff's and Class Members' smartphones constitute "computers" within the scope of the CDAFA.

69. Defendant violated the following sections of the CDAFA:

   (a) Section 502(c)(1), which makes it unlawful to "knowingly access[] and without permission . . . use[] any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data;"

   (b) Section 502(c)(2), which makes it unlawful to "knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network;"

   (c) Section 502(c)(7), which makes it unlawful to "knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network."

70. Defendant knowingly accessed Plaintiff's and Class Members' smartphones without their permission by including within the SDK that Defendant provides to developers, software that

intercepts and transmits data, communications, and personal information concerning Plaintiff and Class Members.

71. Defendant used data, communications, and personal information that it intercepted and took from Plaintiff's and Class Members' smartphones to wrongfully and unjustly enrich itself at the expense of Plaintiff and Class Members.

72. Defendant took, copied, intercepted, and made use of data, communications, and personal information from Plaintiff's and Class Members' smartphones.

73. Defendant knowingly and without Plaintiff's and Class Members' permission accessed or caused to be accessed their smartphones by installing—without Plaintiff's and Class Members' informed consent—software that intercepts and/or takes data, communications, and personal information concerning Plaintiff and Class Members.

74. Plaintiff and Class Members are residents of California and used their smartphones in California. Defendant accessed or caused to be accessed Plaintiff's and Class Members' data, communications, and personal information from California. Defendant uses servers located in California that allow Defendant to access and process the data, communications and personal information concerning Plaintiff and Class Members.

75. Defendant was unjustly enriched by intercepting, acquiring, taking, or using Plaintiff's and Class Members' data, communications, and personal information without their permission, and using it for Defendant's own financial benefit. Defendant has been unjustly enriched in an amount to be determined at trial.

76. As a direct and proximate result of Defendant's violations of the CDAFA, Plaintiff and Class Members suffered damages.

77. Plaintiff and the Classes now seek compensatory damages, injunctive relief, disgorgement of profits, other equitable relief, punitive damages, and attorneys' fees pursuant to § 502(e)(1)–(2)

78. Pursuant to CDAFA Section 502(e)(4), Plaintiff and Class Members seek punitive or exemplary damages for Defendant's willful violations of the CDAFA.

**COUNT II**
**Use of a Pen Register or Trap and Trace Device**
**Cal. Penal Code § 638.51**

79. Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

80. Plaintiff brings this claim individually and on behalf of the members of the Classes.

81. California Penal Code Section 638.50(b) defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

82. California Penal Code Section 638.51 prohibits any person from using a pen register without a court order.

83. Defendant's SDK constitutes a "pen register" because it is a device or process that records addressing or signaling information—Plaintiff and Class Members' location data and personal information—from the electronic communications transmitted by their smartphones.

84. Defendant was not authorized by any court order to use a pen register to track Plaintiff and Class Members' location data and personal information.

85. Plaintiff and the Classes seek injunctive relief and statutory damages in the amount of $5,000 per violation pursuant to Cal. Penal Code § 637.2.

**COUNT III**
**Unjust Enrichment or Restitution**

86. Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

87. Plaintiff brings this claim individually and on behalf of the members of the Classes.

88. Plaintiff and members of the Classes conferred a benefit on Defendant through the use and dissemination of Plaintiff's and Class Members' personal information and geolocation data.

89. Defendant received and is in possession of Plaintiff's and Class Members' personal information and geolocation data, which Defendant used and disseminated for its own monetary benefit.

90. It is unjust under the circumstances for Defendant to retain the benefit conferred by Plaintiff and Class members without compensating them.

## COUNT IV
### Invasion of Privacy

91. Plaintiff realleges and reincorporates by reference all paragraphs alleged above.

92. Plaintiff brings this claim individually and on behalf of the members of the Classes.

93. The California Constitution (like the constitutions of states nationwide) recognizes the right to privacy inherent in all residents of the State and creates a private right of action against private entities that invade that right.

94. Article I, Section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

95. The right to privacy was added to the California Constitution in 1972, through Proposition 11 (called the "Right to Privacy Initiative"). Proposition 11 was designed to codify the right to privacy, protecting individuals from invasions of privacy from both the government and private entities alike: "The right of privacy is the right to be left alone. It is a fundamental and compelling interest . . . . It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information." Ballot Pamp., Proposed Stats. And Amends. To Cal. Const. with arguments to voters, Gen. Elec. (Nov. 7, 1972), argument in favor of Prop. 11, p. 27; *see also Hill v. Colorado*, 530 U.S. 703, 716 (2000) (the right to privacy includes right to be free in one's home from unwanted communication); *Hill v. National Collegiate Athletic Assn.* (1994), 7 Cal.4th 1, 81, (Mosk, J., dissenting).

96. Plaintiff and the Class Members have a legally protected privacy interest, as recognized by the California Constitution, CIPA, common law, and the 4th Amendment to the United States Constitution.

97. Plaintiff and Class Members had a reasonable expectation of privacy under the circumstances, as they could not have reasonably expected that Defendant would violate state privacy

laws. Plaintiff and Class Members were not aware and could not have reasonably expected that unknown third party would install software on their mobile devices that would track and transmit their physical location.

98. Defendant's conduct violates, at a minimum:

    (a) The right to privacy in data, communications and personal information contained on personal devices;

    (b) The California Constitution, Article I, Section 1;

    (c) The California Wiretapping Act; and

    (d) The California Computer Data Access and Fraud Act.

99. Defendant's conduct in secretly intercepting and collecting Plaintiff's and Class Members' personal information and location data is an egregious breach of social norms and is highly offensive to a reasonable person.

100. Defendant's conduct in analyzing, using, and sharing with third parties the personal information and communications that Defendant intercepted and took from Plaintiff's and Class Members is an egregious breach of societal norms and is highly offensive to a reasonable person, and violates Plaintiff's and Class Members' reasonable expectations of privacy.

101. Plaintiff and Class Members did not consent for Defendant to track, collect, or use their personal information and communications.

102. As a direct and proximate result of Defendant's invasion of their privacy, Plaintiff and Class Members were injured and suffered damages. Plaintiff and Class Members are entitled to equitable relief and just compensation in an amount to be determined at trial.

103. Defendant was unjustly enriched as a result of its invasion of Plaintiff's and Class Members' privacy.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

    (a) For an order certifying the Classes under Fed. R. Civ. P. 23 and naming Plaintiff as representative of the Classes and Plaintiff's attorneys as Class Counsel;

(b) For an order declaring the Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff, and the Classes on all counts asserted herein;

(d) For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For an order of restitution and all other forms of equitable monetary relief;

(g) For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: February 14, 2025                **BURSOR & FISHER, P.A**.

By: */s/ Philip L. Fraietta*

Philip L. Fraietta (State Bar No. 354768)
Julian C. Diamond (*pro hac vice* forthcoming)
Andrew Obergfell (*pro hac vice* forthcoming)
1331 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: pfraietta@bursor.com
       jdiamond@bursor.com
       aobergfell@bursor.com

*Attorneys for Plaintiff*