UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LISA TSERING, et al., <br><br> Plaintiffs, <br><br> v. <br><br> META PLATFORMS, INC., <br><br> Defendant. | Case No. 25-cv-01611-RFL <br><br> **ORDER GRANTING MOTION TO DISMISS** <br><br> Re: Dkt. No. 32 |

## I. INTRODUCTION

Plaintiffs Lisa Tsering and Dominique Davis brought a putative class action suit against Defendant Meta Platforms, Inc., alleging that Meta acquired and tracked third-party application users' geolocation and other data without their consent through the development and dissemination of its Facebook software development kit ("SDK") and component SDKs, including the Facebook Audience Network SDK. Plaintiffs' Second Amended Complaint comprises four claims: (1) violation of the California Computer Data Access and Fraud Act ("CDAFA") (2) use of a pen register in violation of California Penal Code Section 638.51, (3) unjust enrichment, and (4) invasion of privacy. (Dkt. No. 28 ("SAC").) Meta now moves to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (Dkt. No. 32.) For the reasons that follow, the motion to dismiss is **GRANTED** with leave to amend.

## II. BACKGROUND

The facts detailed below are based on the allegations contained in the operative complaint, the truth of which the Court accepts for purposes of resolving the motion to dismiss. *See Boquist v. Courtney*, 32 F.4th 764, 772 (9th Cir. 2022).

1

A.     Meta's Development of the Facebook SDKs

SDKs are "collection[s] of development tools that can be incorporated into a mobile application."  (SAC ¶ 46.)  Meta developed the Facebook SDK and the Facebook Audience Network SDK so third-party app developers can incorporate the SDKs into their applications.  (SAC ¶¶ 45–47.)  One of the functions of Meta's SDKs is to glean information about consumers that Meta can incorporate into its targeted advertising services.  (SAC ¶ 47.)  In particular, the Facebook Audience Network SDK allows third-party app developers "to deliver targeted advertising to its users generated by Facebook."  (SAC ¶ 49.)

The Facebook Audience Network SDK facilitates targeted advertising by collecting the location data of mobile application users who have the SDK embedded in their apps and transmitting the data back to Meta.  (SAC ¶ 49.)  An app developer must explicitly incorporate the Facebook Audience Network SDK into their application.  (*See* SAC ¶ 48.)  Once installed on an application, the Facebook Audience Network SDK collects, among other things, "precise" "location data" from the application's users.  (SAC ¶ 49.)

Applications that incorporate the Facebook Audience Network SDK "request access to the location data generated by a mobile device's operating system."  (SAC ¶ 54.)  As a result of this request, the Facebook Audience Network SDK receives the precise latitude and longitude of the device on which the application is installed, as well as a timestamp and a unique mobile device identifier.  (SAC ¶ 55.)  The Facebook Audience Network SDK receives this data "as often as the mobile device's operating system provides it—ranging from almost no collection when the device is idle, to every few seconds when the device is actively moving—and transmits it directly to [Meta's] servers."  (SAC ¶ 55.)

The data Meta collects via the Facebook Audience Network SDK can provide a significant amount of information about a user.  The location data Meta collects can include sensitive information such as where a user lives, works, and receives medical treatment.  (SAC ¶ 56.)  Furthermore, a small sample of location data "is sufficient to identify an individual."  (SAC ¶ 71.)  Therefore, "[b]y collecting timestamped geolocation data, unique device identifiers,

and device fingerprint data, [Meta] can connect an ostensibly 'anonymous' ID . . . to an individual and then collect data on their interests and activities." (SAC ¶ 73.) Combing through all this data can allow Meta to "create a comprehensive consumer profile" (SAC ¶ 73), which enables more targeted advertising and leads to increased advertising revenues. (SAC ¶ 47.)

Meta thus has a clear interest in its SDKs being used as widely as possible. Indeed, the more widely Meta's SDKs are used, the more data it can acquire and the broader the array of applications through which it can advertise. (SAC ¶ 48.) Accordingly, Meta encourages app developers to use the Facebook SDK and the Facebook Audience Network SDK by making the SDKs free to use. (SAC ¶ 47.) As a result of Meta's efforts, the Facebook Audience Network SDK has been incorporated into "tens of thousands" of third-party apps, which have been downloaded onto "hundreds of millions of unique devices." (SAC ¶ 53.)

### B.     Meta Acquires Plaintiffs' Data Allegedly Without Their Consent

Tsering and Davis downloaded, respectively, Solitaire and Nextdoor, applications which contain the Facebook SDK and the Facebook Audience Network SDK. (SAC ¶¶ 10–12, 21–23.) They aver that when they downloaded the applications, they enabled location services within those applications only. (SAC ¶¶ 13, 24.) Tsering and Davis assert that at no point during the process of downloading those applications did they ever consent to their geolocation information being shared with Meta or any third-party for advertising purposes. (SAC ¶¶ 13, 24.) They allege that that at no point did the apps or Meta inform them that Meta's SDKs were collecting their geolocation data, and at no point did Meta seek their permission to access and collect their data. (SAC ¶¶ 13, 19, 24, 30.) However, as a result of their use of Solitaire and Nextdoor, the Facebook Audience SDK collected their geolocation data and transmitted it to Meta, and Meta was able to monetize that data by incorporating it into its advertising products. (SAC ¶¶ 18, 29.) Tsering and Davis represent they would have refrained from using those apps, or any other apps incorporating the Facebook SDK or Facebook Audience Network SDK had they known their use of the apps would enable Meta to receive and monetize their data. (SAC ¶¶ 20, 31.)

3

### III.    LEGAL STANDARD

To survive a Rule 12(b)(6) challenge, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must allege "more than a sheer possibility that a defendant has acted unlawfully." *Id*.

In ruling on a motion to dismiss, a court may consider only "the complaint, materials incorporated into the complaint by reference, and matters [subject to] judicial notice." *See UFCW Loc. 1500 Pension Fund v. Mayer*, 895 F.3d 695, 698 (9th Cir. 2018) (citation omitted). A court must also presume the truth of a plaintiff's allegations and draw all reasonable inferences in their favor. *See Boquist*, 32 F.4th at 773. However, a court need not accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008 (9th Cir. 2018) (citation omitted).

### IV.    DISCUSSION

#### A.    Meta's Request for Judicial Notice

Meta's request for judicial notice is granted as to the Meta blog post, MobilityWare's privacy policy, and Nextdoor's privacy policies and notice. (Dkt. No. 34.) Each of those documents is incorporated by reference into the Second Amended Complaint. The Second Amended Complaint cites the blog post in support of its assertion that Meta's SDKs collect user location data. (SAC ¶ 5 n.1.) And the Second Amended Complaint alleges that MobilityWare and Nextdoor failed to disclose that Meta's SDKs were embedded in their apps, the SDKs collected user geolocation data, and the SDKs sent the data to Meta. (SAC ¶¶ 19, 30.) Tsering and Davis's claims "necessarily depend[] on application of" the privacy policies and notices for MobilityWare and Nextdoor, and so those documents are appropriately subject to judicial notice. *Garcia v. Enter. Holdings, Inc.*, 78 F. Supp. 3d 1125, 1136 (N.D. Cal. 2015). The remainder of

the documents included in Meta's request for judicial notice are not necessary to this ruling, so the request is denied as moot as to those documents.

### B.     Article III Standing

"The Court has an independent duty to determine a plaintiff's standing to sue." *Brill v. Chevron Corp.*, No. 15-CV-04916-JD, 2017 WL 76894, at *2 (N.D. Cal. Jan. 9, 2017).  To demonstrate standing, a plaintiff must show "(1) [they have] suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Cal. Sea Urchin Comm'n v. Bean*, 883 F.3d 1173, 1180 (9th Cir. 2018), *as amended* (Apr. 18, 2018) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000)).

Tsering and Davis have standing to sue.  The scope of the alleged data collection and the creation of user profiles in this case is materially more invasive than the more limited tracking at issue in the Ninth Circuit's recent decision in *Popa v. Microsoft Corp.*, 153 F.4th 784 (9th Cir. 2025).  In *Popa*, the tracking of plaintiff's non-sensitive interactions with a single website, www.petsuppliesplus.com, did not give rise to a cognizable Article III injury.  *Id.* at 786, 791–94.  Here, by contrast, Tsering and Davis allege not only that their geolocation data has monetary value, but also that Meta was able to monetize their data by collecting it, creating comprehensive user profiles, incorporating it into its advertising products, and selling it for advertising purposes. (SAC ¶¶ 18, 29, 61, 73, 95.)  Accordingly, "Plaintiffs have adequately pleaded an entitlement to [Meta's] profits from users' [location] data sufficient to confer Article III standing." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 600 (9th Cir. 2020).

### C.     CDAFA Claim

Tsering and Davis's CDAFA claim is dismissed.  Their claim encompasses violations of three sections: Section 502(c)(1), which applies to anyone who "[k]nowingly accesses and without permission . . . uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B)

wrongfully control or obtain money, property, or data"; Section 502(c)(2), which applies to anyone who "[k]nowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network"; and Section 502(c)(7), which applies to anyone who "[k]nowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network."  Cal. Penal Code § 502(c)(1), (2), (7).

      As an initial matter, Meta is incorrect that the fact that third-party developers must install the SDK onto their applications means that Meta did not "use" any data or "access" any computer system.  (*E.g.*, Dkt. No. 32 at 12, 16.)  The term "access" is defined to include actions that "cause output from . . . [or] communicate with" a computer system or network.  Cal. Penal Code § 502(b)(1).  The complaint alleges that the Facebook Audience Network SDK was developed specifically to facilitate the collection of user data for the purpose of allowing app developers to deliver targeted advertising to their users generated by Facebook.  (SAC ¶ 49.)  The Facebook Audience Network SDK allegedly collects geolocation data from users' cell phones and transmits that data to Meta, which creates consumer profiles using the data and sells it.  (SAC ¶¶ 5, 6, 14, 25.)  As such, Meta's SDKs allegedly "cause" third-party applications to "output" user data, which constitutes "access" by Meta of that data.  Causing such output is plausibly alleged to be intentional, not accidental.  Furthermore, Meta allegedly designed its SDKs to collect user data, intending to use the data for targeted advertising.  These allegations are sufficient to establish that Meta engaged in both "use" and "access" under CDAFA.

      However, Plaintiffs nonetheless fail to state a claim because they have not adequately pled that Meta knew its use and access was without the user's permission.  The statutory requirement that an individual act "knowingly" "imports . . . an awareness of the facts which bring the proscribed act within the terms of the statute."  *People v. Hawkins*, 98 Cal. App. 4th 1428, 1438 (2002), *as modified on denial of reh'g* (July 2, 2002) (quoting *People v. McDaniel*, 22 Cal. App. 4th 278, 285 (1994)).  In other words, the term "knowingly" modifies *each* element of the alleged violation.  *Id.*  Thus, the phrase "knowingly and without permission" in Sections

6

502(c)(1), (2), and (7) requires that an individual be aware both that they are using data or accessing a computer *and* that they are doing so without permission.

Requiring an individual to know that they lack permission to engage in the proscribed acts aligns with the purpose of CDAFA, which was "originally enacted to combat 'computer crime' and hacking." *Heiting v. Taro Pharms. USA, Inc.*, 709 F. Supp. 3d 1007, 1020 (C.D. Cal. 2023). Otherwise, CDAFA would apply to individuals who knowingly access a computer or use data under the reasonable but mistaken belief that they had permission. For example, as discussed at oral argument, under Plaintiffs' interpretation of CDAFA, an SDK developer would be liable for receiving data about users even if the SDK developer had received false assurances from a third-party app developer that users had consented to this sharing of their data. In essence, developers would be strictly liable for other parties' misdeeds or misinformation to consumers. Nothing in CDAFA's text or purpose supports such an expansive interpretation.

Tsering and Davis's complaint fails to plausibly allege that Meta knew that it lacked users' permission to access their smartphones and use their data. The Second Amended Complaint alleges (a) that Meta intentionally collected third-party app users' geolocation data, as evidenced by its blog post informing app developers that it "may receive and process certain contact, *location*, identifier, and device information" (SAC ¶ 5); (b) that Meta did not disclose to application users that it was collecting their geolocation data (*e.g.*, SAC ¶ 13); and (c) that at least some app developers are unaware of the extent to which Meta uses and monetizes the data it collects via its SDKs (SAC ¶¶ 6, 61). Those allegations are insufficient, without more, to raise a plausible inference that Meta knew the third-party app developers had not sought permission from the users to access the location data at issue.

Plaintiffs suggest that Meta must have known that third-party app developers were not disclosing the geolocation tracking to consumers, because Meta provided only "opaque" information to the app developers about the tracking. (SAC ¶ 65.) That conclusory allegation, however, is insufficient to raise the necessary inference. Moreover, MobilityWare and

7

Nextdoor's privacy policies *do* disclose that user geolocation data may be shared with third-party advertising partners, with MobilityWare even specifically naming Facebook.

MobilityWare's privacy policy states that MobilityWare's third-party partners collect and receive geolocation information, and that such information might be combined with other collected information for business intelligence and advertising purposes. (*E.g.*, Dkt. No. 33-7 at 4 ("The type of information that [MobilityWare] may collect includes your first and last name, email address, geo-location, password, or other identifying information you choose to provide."); Dkt. No. 33-7 at 5 ("We, and our partners acting on our behalf, use cookies, web beacons, and similar technologies to collect information about the pages you view, your movements around our website, the links you click and other actions you take on our Services.  We may also use this technology to gather demographic information about our user base as a whole. . . .  We may also collect information from features and functions offered by other sources such as social networking sites like Facebook, Twitter or Linkedin.  These features may collect your IP address, pages you visit on our website, or set a cookie to enable the feature to function properly. . . .  We may process, use, combine, disclose, and retain such information in accordance with this Privacy Policy."); Dkt. No. 33-7 at 7 ("We may share your information, including personal information, with third parties or allow third parties to collect this information from our Services, as follows:  With your consent or at your direction and in some ways not specifically described in this Privacy Policy, including if we notify you through our Services that the information you provide will be shared in a particular manner and you provide such information."); Dkt. No. 33-7 at 11 ("We may use, or disclose the personal information we collect for one or more of the following business purposes: . . .  To personalize your Website and Services experience and to deliver content and product and service offerings relevant to your interests, including targeted offers and ads through our Website, third-party sites, and via email or text message (with your consent, where required by law).").)

Similarly, Nextdoor's privacy policy indicates that its third-party advertising partners collect user geolocation information, which may be personally identifying, and use the

8

information for customized advertisements. (*E.g.*, Dkt. No. 33-12 at 4 ("You may choose to grant [Nextdoor's] Services permission to access your device's precise geolocation, which we may use to confirm your address and help us operate or personalize our Services, including . . . helping us show you more relevant content or ads."); Dkt. No. 33-12 at 6–7 ("We use personal information to provide and improve advertisements and other commercial offerings both on and off our Services . . . . Our third party advertising partners also use cookies and similar technologies to collect information about Members for advertising purposes."); Dkt. No. 33-12 at 8 ("With your consent, our advertising partners use cookies and similar technologies to collect information about our Members and their devices over time across Nextdoor and other online services. . . . Our advertising partners may be able to associate this information with you based on your advertising identifiers or other personal information they have about you.  Our advertising partners may then use the information they collect to provide our Members with customized ads on Nextdoor as well as on different websites and services, and to measure the effectiveness of their ads.").)

       To be sure, the existence of these disclosures does not render it implausible that Tsering and Davis did not consent to Meta's collection and use of geolocation data.  Among other issues, the Court cannot determine as a matter of law whether Tsering and Davis received adequate notice of Meta's collection and use of geolocation data, or whether the Nextdoor and MobilityWare privacy policies applied to Tsering and Davis's accounts.  (Dkt. No. 35 at 11–12.)  However, these disclosures render it implausible that Meta provided such opaque information to Nextdoor and MobilityWare that Meta had to know the third-party app developers could not possibly obtain effective consent from consumers.  In sum, Tsering and Davis fail to adequately allege Meta's knowledge that the use and access of user data was without permission, so the CDAFA claim is dismissed.

       The dismissal is with leave to amend, to allow Tsering and Davis to attempt to allege additional facts from which a plausible inference could be drawn that Meta was aware that its use and access was without permission.  Amendment is not futile.  Although Meta raises other

challenges to the CDAFA claim, those do not bar Plaintiffs' claim, for the reasons explained below.

Meta argues (1) that Tsering and Davis have not alleged that they have suffered damage or loss as required by CDAFA, (2) that its use of data does not count as "use" under Section 502(c)(1), and (3) that it did not access user data "without permission" for the purpose of Section 502(c)(7). (Dkt. No. 32 at 19–21.)

As to damage or loss, this Court previously concluded in *Smith v. Rack Room Shoes, Inc.*, No. 24-CV-06709-RFL, 2025 WL 2210002 (N.D. Cal. Aug. 4, 2025), that a defendant's alleged unjust profit from the use of a plaintiff's personal information, which holds financial value to the defendant, can plausibly constitute a "damage or loss" under CDAFA. *Id*. at *3. Because California law requires disgorgement of unjustly earned profits, a plaintiff has a stake in profits garnered unjustly from their data and is damaged under CDAFA by not having received a share of those profits. *Id*. (citing *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 600–01). If Tsering and Davis are able to correct the deficiencies identified above through amendment, their failure to receive a portion of Meta's profits from their data would constitute "damage" under CDAFA. *Cf. Pratt v. Higgins*, No. 22-CV-04228-HSG, 2023 WL 4564551, at *9 (N.D. Cal. July 17, 2023) (stating that "lost revenue" counts as "loss" under CDAFA). While Meta suggests that such profits would be sufficient for Article III standing but would not constitute "damage or loss" under CDAFA (Dkt. No. 32 at 20), nothing in CDAFA's statutory language supports such a distinction. CDAFA does contain language that losses "shall include" expenditures to determine whether a computer system or data was damaged, Cal. Penal Code § 502(e)(1), but it nowhere limits the terms "damage" or "loss" to those costs or the costs of damaged computer systems or data themselves.

Meta also argues that under the doctrine of *ejusdem generis*, the requirement that an individual "use" data under Section 502(c)(1) should be understood as prohibiting only use "similar to alteration, damage, deletion, or destruction." (Dkt. No. 32 at 21.) However, because deleting or destroying data are not "uses" of data, *ejusdem generis* does not apply. Furthermore,

10

defining the word "use" as encompassing only acts similar to alteration, damage, deletion, or destruction would result in the term having different meanings in Section 502(c)(1) and Section 502(c)(2), where the word "use" is preceded by the words "takes" and "copies." "It is a well-established principle of statutory construction that the same words or phrases are presumed to have the same meaning when used in different parts of a statute." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 933 F.3d 1088, 1095 (9th Cir. 2019) (cleaned up). Accordingly, Meta's collection of user data and subsequent creation of consumer profiles constitutes "use" under Section 502(c)(1).

      Lastly, Section 502(c)(7) does not require that an individual "circumvent[] technical or code-based barriers" to access a computer system "without permission." (Dkt. No. 32 at 21 (quoting *Bui-Ford v. Tesla*, No. 4:23-CV-02321, 2024 WL 694485, at *5 (N.D. Cal. Feb. 20, 2024)).) While overcoming "technical or code-based barriers" is one way to establish that a defendant acted without permission, it is not the only way. *In re Carrier IQ, Inc. Consumer Priv. Litig.*, 78 F. Supp. 3d 1051, 1099 (N.D. Cal. 2015); *see also Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1049 (S.D. Cal. 2023). Indeed, the Ninth Circuit has already interpreted CDAFA not to require circumventing technical barriers to show that data was "use[d]" "without permission." *United States v. Christensen*, 828 F.3d 763 (9th Cir. 2015). In *Christensen*, the Ninth Circuit concluded that a police officer violated Section 502(c)(2) by using valid credentials to log into a police database to retrieve information for unauthorized purposes. *Id.* at 777, 789. The use was "without permission," even though no technical barriers were circumvented. *Id.* That matches the plain meaning of the term "without permission." The term "without permission" is presumed to have the same meaning when modifying "use" in Section 502(c)(2) as when modifying "access" in Section 502(c)(7), which are parts of the same statute. *See Animal Legal Def. Fund*, 933 F.3d at 1095. Access, like use, may be without permission if it has been forbidden through non-technical means.

      Accordingly, amendment is not necessarily futile, and dismissal of the CDAFA claim is with leave to amend.

### D. Pen Register Claim

Tsering and Davis's complaint fails to state a pen register claim against Meta. A "pen register" is "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b). Section 638.51 of the California Penal Code prohibits the installation or use of "a pen register or a trap and trace device without first obtaining a court order." Cal. Penal Code § 638.51(a).

The Second Amended Complaint does not adequately allege that the information collected was "dialing, routing, addressing, or signaling" information. To be sure, SDKs installed in mobile devices can constitute pen registers in some circumstances. *Greenley*, 684 F. Supp. 3d at 1050. However, Tsering and Davis allege only that Meta's SDKs collected users' geolocation data, "unique device identifiers," "device fingerprint data," and "personal information." (SAC ¶¶ 73, 104.) There is no allegation that this information is used for "dialing, routing, addressing, or signaling."

Correspondingly, the complaint fails to adequately allege what exactly the electronic communication at issue was, and thus fails to allege that the information collected did not constitute the content of such communication. *See Shah v. Fandom, Inc.*, 754 F. Supp. 3d 924, 928–29 (N.D. Cal. 2024) (IP addresses were alleged not to constitute content, because they were alleged instead provide addressing information for the user's requests sent to the website). For example, if Plaintiffs' cell phones periodically sent their geolocation information to the app developers as a standalone message, and then the app developers forwarded that information to Meta through the SDK, that would appear to be the content of the underlying communication.

Tsering and Davis's pen register claim is dismissed with leave to amend.

### E. Invasion of Privacy Claim

Tsering and Davis's invasion of privacy claim is likewise dismissed with leave to amend. To succeed on an invasion of privacy claim, a plaintiff must establish (1) that the defendant

intentionally intruded into a "place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy," and (2) "the intrusion must occur in a manner highly offensive to a reasonable person." *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 286 (2009).

The Second Amended Complaint fails to plausibly allege that the intrusion occurred in a manner "highly offensive to a reasonable person." "Courts in this district have held that data collection and disclosure to third parties that is 'routine commercial behavior' is not a 'highly offensive' intrusion of privacy." *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1090 (N.D. Cal. 2022) (citing, *inter alia*, *Low v. LinkedIn Corp.*, 900 F. Supp. 2d 1010, 1025 (N.D. Cal. 2012)). Accordingly, courts have required that plaintiffs bringing invasion of privacy claims arising from the collection and disclosure of personal data "sufficiently allege that Defendants did more than engage in such routine behavior"—*i.e.*, that they engaged in "secret or deceptive data collection." *Hubbard v. Google LLC*, No. 19-CV-07016-SVK, 2024 WL 3302066, at *7 (N.D. Cal. July 1, 2024). While collecting geolocation information with users' permission is indeed routine commercial behavior, *cf. In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1063 (N.D. Cal. 2012) (concluding that transmission of such information is routine commercial behavior even if done without users' knowledge and consent), as described above, the Second Amended Complaint fails to plausibly allege that Meta knew that it was collecting third-party app users' geolocation data without their consent. Accordingly, there is no additional aspect of Meta's data collection in this case suggesting that Meta was intentionally engaged in a secret or deceptive, and thus highly offensive, intrusion. Therefore, the motion to dismiss with respect to this claim is granted with leave to amend.

### F.  **Unjust Enrichment Claim**

Tsering and Davis's unjust enrichment claim is dismissed. "A claim for unjust enrichment is essentially a claim for restitution, the elements of which are that the defendant received and unjustly retained a benefit at the plaintiff's expense." *See Lau v. Gen Digital Inc.*, No. 22-CV-08981-RFL, 2024 WL 1880161, at *5 (N.D. Cal. Apr. 3, 2024), *aff'd sub nom. Karwowski v. Gen Digital, Inc.*, No. 24-7213, 2025 WL 3002610 (9th Cir. Oct. 27, 2025) (citing

*Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (2010)). Because Tsering and Davis "have not stated a claim against [Meta] for any unlawful conduct, they have also failed to state an unjust enrichment claim." *Doe I v. Google LLC*, 741 F. Supp. 3d 828, 849 (N.D. Cal. 2024). Accordingly, the motion to dismiss with respect to this claim is granted with leave to amend.

## V.     CONCLUSION

For the foregoing reasons, Meta's motion to dismiss is granted. Dismissal is with leave to amend because the Court cannot conclude on the current record that amendment would be futile. If Tsering and Davis wish to file a Third Amended Complaint correcting the deficiencies identified above, they shall do so by **February 9, 2026**. Tsering and Davis may not add new claims or parties without leave of the Court or stipulation by the parties pursuant to Federal Rule of Civil Procedure 15. If no such amended complaint is filed by that date, the claims that were dismissed in this Order will remain dismissed with prejudice and the case will be closed.

**IT IS SO ORDERED**

Dated: January 12, 2025

RITA F. LIN
United States District Judge